The first case for argument this morning is 23-1546, Altria Client Services v. R.J. Reynolds. Mr. Burnett, whenever you're ready. And could we just take a couple minutes on the top with both sides just to confirm we've gotten this slew of paper in recent weeks about 28J and what's going on in the district court. It's our preliminary assessment that doesn't, at least at this point, affect anything we're doing here in this case. And I wonder if you could confirm that or speak to that very briefly. Yes, Judge Probst. So we did move in the district court for relief under Rule 60B on two grounds to obtain relief from the past judgment for infringement and damages and for relief from the prospective ongoing royalty order. The district court granted an indicative ruling only as to the latter. Now the ongoing royalty order is under review in this but not directly, only because the ongoing royalty rate is based on the rate that was found by the jury and that was applied on a going forward basis. So you're right. The alternative ground that we asked for, which was to vacate the past judgment for infringement and damages, would directly implicate the issues that are before the court in this appeal. I think if the court had granted the full relief we requested for an indicative ruling, we would be here asking the court for a limited remand. I think a limited remand would be appropriate in these circumstances. If the court were to send the case back, the district court could hold the evidentiary hearing on the 60B-5 issue, the prospective ongoing... But it's not necessary or compelled, it doesn't seem to me. I agree with that, Judge. I agree. It's not necessary, that is correct. Okay. And could I ask your friend on the other side if he agrees with that? Mark Perry, Your Honor. We do agree with that. The Rule 60 motion essentially had two parts, backward looking and forward looking. The court denied it as to backward looking, which is the only thing that's at issue in this appeal. Therefore, it's been denied outright. The district court indicated the desire to hold an evidentiary hearing once the case returns to the district court. We submit it would be the most efficient to do that after the appeal is concluded, once the issues have been resolved, if the judgment's reversed, then anything else can be dealt with at the same time, all in the ordinary course, rather than dividing it up into different pieces. Okay. Thank you, Your Honor. All right. So let's proceed with the case as we have it. Thank you, Your Honor. May it please the court. Good morning. My name is Jason Burnett. I'm here on behalf of Archer Reynolds Vapor Company, the appellant. I reserve three minutes of my time for rebuttal. The district court in this case entered a judgment for $95 million against Reynolds based on a royalty rate that was not supported by the two prior license agreements that Altria's expert relied on, and that was not a portion to account for admittedly non-infringing features of the views alto. I'd like to address these two damages issues first, and then turn to the exclusion of the wired video evidence and that effect on Reynolds' public use defense as to the JUUL device, and then if time permits, address the non-infringement issue. And you're going to start with the 5.25 percent? I was planning to start with the apportionment issue, but I'm happy to start with 5.25. Why don't you start with 5.25? Yes, Your Honor. So there was testimony from Dr. I'm sorry, Mr. Malachowski, Altria's damages expert, that these two prior license agreements, one both with Fontam, a non-party, one with Reynolds, and one with another entity, Newmark, that both of these agreements supported a 5.25 percent royalty rate. First, on the Fontam-Reynolds agreement, there's not a rate mentioned in that agreement. Both of the agreements were to run till 2030, am I correct on that? Yes, I think it's 2029. Well, okay, go ahead. So they were for the lives of the Fontam patents, which I think was 2029 or 2030. The Fontam-Reynolds agreement uncovered all of Reynolds' products, e-cigarette products, and there was not a rate in that agreement. So the agreement there was for a lump sum payment. Mr. Malachowski converted that lump sum payment to a 2.1 percent. Can I just ask you a more preliminary question? You didn't file a Daubert motion. There was no attempt to exclude this testimony for the reasons, and you didn't do a Rule 59. So what we're left with is what? We've got to find something that we can hang our hat on to support the verdict for the jury, the jury's verdict. Reynolds did file a Rule 59 motion and a Rule 50B motion as to this testimony about the royalty rate. Reynolds did not file a Daubert or Rule 702 motion as to the royalty rate. Reynolds did file a Rule 702 Daubert motion as to the apportionment opinions of these two experts. Right, but not on this rate. Not on the rate. That is correct, Your Honor. So we are asking for the court to reverse the denial of the motion for a new trial and for Rule 50B relief because there was not substantial evidence to support the 5.25 percent rate. And all along, you were asking, your alternative amount was 0.21 percent? Yes, Your Honor. And notwithstanding some testimony, arguably with some heft on cross-examination, that tweaked the rate to 2.1 percent versus 5.25 percent. I didn't see anywhere in your closing argument or elsewhere where you were offering up to the jury, no, this is the alternative rate. It should have been 2.1 based upon the testimony we've elicited at trial. Am I correct about my assessment of the record? That is correct. Our position was that the appropriate royalty rate was 0.21 percent based on what Malik held. We viewed the Fontam-Reynolds agreement as the most comparable agreement, so we relied on that. When you convert the lump sum rate to a royalty rate, you get 2.1 percent. And then we apportioned because the Fontam patents are 63 patents among 12 different patent families. Our expert, Mr. Alarcon, viewed one patent family as being the relevant patent family for this technology, the Alto technology, and that's only 10 percent of the Fontam patents. And so 2.1 percent, taking 10 percent of that is 0.21 percent, and that was the rate that we proposed to the jury, Your Honor. But on the Fontam-Reynolds agreement, that rate is not in the agreement. Mr. Malikowski admitted that. What he relied on was a stipulation during the course of this litigation that Reynolds was aware that other Fontam licensees were paying 5.25 percent. But Mr. Malikowski admitted that he had not reviewed those other license and that he wasn't saying. He can't say that those prior license agreements with Fontam were technologically or economically comparable, and that's a minimal requirement. Did he actually testify that based on the Reynolds agreement that 5.25 was the right number, or did he say, as what you just said suggested, that other evidence of 5.25 indicated that that is the right number? He did rely on the Fontam-Reynolds agreement, but he acknowledged that the rate was not in the agreement, and he found that it wasn't relevant because it would cover multiple products. I understand that he acknowledged that the arithmetic, as was presented to him on cross-examination, led to a 2.1 percent, but did he ever say, well, notwithstanding that, that that agreement supports the 5.25? I guess that's really the thrust of my question. I don't believe he directly relied on the Fontam-Reynolds agreement to support the rate. He did rely on the stipulation that Reynolds had entered into during the course of the agreement with Fontam that there were other agreements for 5.25 percent. So the only point I'm making about the Fenton-Fontam-Reynolds agreement is that Mr. Malachowski's testimony asked if that agreement was based on other licenses which are not in the record, which he didn't review, which he couldn't say, that's what he said in court, cannot say that they are technologically or economically comparable. So that leaves the Fontam-Newmark agreement, which does have a rate on the cover page of the agreement of 5.25. Is that the one with the $43, $44 million? Okay. I found it a little confusing in terms of the timing, in terms of the argument that was made that that wasn't really the right number because the agreement was supposed to go from 2017 to 2029 and it ended. Can you kind of, because it was most confusing because when you try to dig deep, the payment was staggered so that it seems like it confused, it's confusing as to what the timing was for the entire agreement and the payment giving the staggered portion. Correct. Do you understand the question? Absolutely. So putting the 5.25 on the cover aside because that applied to other kinds of transactions for overseas which are not relevant, not comparable to the U.S.-based license here, what you are left with is the $43 million number that was paid over time in fixed payments. Mr. Malachowski purported to convert that $43 million number to a royalty rate and he did that based on projected sales. So they had the documents from Newmark that showed what they were projecting at the time based on the payments. If you carry the projected sales out through the life of the patents, you get rates at a minimum of $89 million. So he stopped the assessment at 2023, right? So he came up with $44 million as of 2023 and zero in effect between 2023 and 2023. Yes, Your Honor. And so based on stopping the analysis at 2023, Mr. Malachowski was able to say, well, based on projections through that time period, that's $44 million. That's very close to the $43 million that Newmark actually paid. Therefore, that supports a 5.25 rate. But as your questions indicate, Judge Bryson, there was, when Newmark entered into that license agreement, there was several more years worth of value in those patents than through 2023. Now, it just so happened that in actuality, Newmark exited the e-cigarette market. So there weren't actual sales past that rate. And so I think that would be what Mr. Malachowski would say would be the basis for stopping at that point. But at the time that the agreement was entered in 2016, we have in Newmark some projections about what they were thinking of in terms of the value of entering this agreement for $43 million. And it's far below 5.25% because that would be at a minimum $89 million for a lump sum payment. And Newmark agreed to pay 43. And so that doesn't support the 5.25 rate. So what number does that lead us to? I can't do the calculations in my head. I haven't done the calculation. Maybe, I don't know if it's 2.1. Well, how do you reconcile that? And was it both agreements? Agreement had the 3.6 sort of clause. That's the font in Newmark as well. Okay. So if under your calculations, it comes out to a lot less, even in the 2% range, how do you reconcile that with if they at the time, based on the projected sales, really thought the rate was something like 2%? There's a clause in there that says that if anybody else gets less than 3.6%, you get a do-over or you get some questioning. How does that make any sense? Well, it makes sense that if Newmark went into an agreement where it was thinking it was paying 2.1%, that it would seek to get the benefit if anybody else was paying less than 3.6%. That would encompass going down even below the rate that Newmark was thinking it was paying. I mean, how does that, why does that make sense just walking in? You could understand if you ask, if you're contemplating a rate that's higher than 3.6, then it makes sense to say, well, wait, if we find out other people are paying 3.6, we get a do-over. But if you're paying less than, if you've agreed to something less than 2.3 points, I'm sorry, less than 3.6, why does it make sense that that would result in a do-over in these circumstances? That's what the parties agreed to. There's not testimony in the record about that. The point that was made at trial about why this referee clause supports the rate was that Mr. Malachowski said, there's this clause. There was, in fact, a letter that was purported to trigger the review by the referee. Mr. Malachowski's testimony was that was the Reynolds FONTM agreement, and that there was never a re-evaluation of the FONTM Newmark. So at a minimum, the FONTM Reynolds agreement must be worth more than 3.6%. The problem with that is we had Newmark's corporate representative, through videotaped deposition, testify at trial, do you know what agreement triggered this referee review? And Altria's corporate representative said, I would be speculating. They didn't know what agreement had triggered the referee's review and whether any rate had ever been calculated based on a subsequent agreement after the FONTM Newmark agreement. Was the 3.6% a triggering mechanism for the review? Yes, Your Honor. So we don't know whether it was FONTM Reynolds. The district court in its post-judgment order acknowledged this. Mr. Malachowski couldn't say whether it was the FONTM Reynolds agreement that actually triggered the review. And in any event, 3.6% is not 5.25%. So the 3.6% rate does not support a 5.25% rate. Here's the problem I have, in all candor, is that they've got 5.25%. Maybe it's shaky. Arguably, it's shaky. But if you're sitting in the jury, and you've got this testimony about the 5.25% and pointing to various stuff, which you try to shoot down as best you can, and they've got nothing on the other end. I mean, they've got, you're asking for 0.21%. Somebody's saying it's 2.1%. Somebody else is saying maybe it's 3.6%. It doesn't offer much to the jury to say, well, everything's a little shaky, and there are various numbers floating around, but I'm going to pick 5.25% because you've got five little pillars there that are pointing in that direction, and an expert that's justifying it pretty strongly. Given where we are in terms of reviewing a jury verdict, I'm having a hard time. So what can you do about that? Respectfully, Your Honor, on substantial evidence review after a jury verdict, the court looks to see whether the expert testimony is actually supported by the actual licensing evidence. This is from the Laser Dynamics case. In the Lucent case, the court looked at whether the royalty rate was actually, that was stated on the face, a rate on the face of an agreement was actually supported by that rate, and the court said, no, if you go ahead and look at the agreement, it's more complicated than that. But they've got to come up with a number. So what has stronger support in the record? There are all these other numbers floating around. They've got some reason to look at the 5.25. What other number would, if they had come up with a 2.1, or if they had come up with a 3.6, you could have been here arguing that those are insufficient as well, correct? Potentially, Your Honor. Yes, but it's not Reynolds' burden to prove the royalty rate. It was Altria's burden to prove the royalty rate with substantial evidence. These five pillars that were mentioned, none of them is supported by the actual licensing evidence. And that's the reason why the rate should not be sustained, Your Honor. Every one of these bases was based on an interpretation of the rate that's not supported by the two prior license agreements. And when you have the license agreements, you look to see whether the expert's testimony is actually supported by substantial evidence, and it wasn't in this case. Therefore, a new trial should have been granted, or JMAL should have been granted by the district court. I'm seeing far into my rebuttal time. You are, and my colleagues don't have anything else. Why don't we save your rebuttal and rest assured that all of the other issues that are here have been briefed in detail, and that will obviously carry the day for us. Okay, thank you. Thank you. Good morning. Good morning, Your Honor. May it please the court. We'll start where my friend ended at 5.25%. Yeah, let's talk about that, since in fairness to your friend, we haven't raised the other issue. We have two comparable licenses in evidence, with no objection. We have Mr. Malachowski's testimony about them in evidence, with no objection, right? There was no Daubert challenge and no trial objection to any of this testimony. So we have... Well, the absence of a Daubert challenge doesn't... There was something in your brief that kind of led me to think maybe you were suggesting that not having challenged on Daubert, they had foregone a challenge to the sufficiency of the evidence, but that's not true, right? That's not our position. All right, good. But our only insufficiency is our point. We're not in some... You're only in insufficiency. So what do you say about the 2.1%, which does look like that's what the math leads one to conclude. Why does the Reynolds... Fontham-Reynolds agreement leads you to 5.25%. Sure, Your Honor. Setting aside the stipulation for a moment. Okay. So Mr. Malachowski testified to this in his testimony at 28368-69. And his point was that the business made a range of projections in entering into the agreement. And if I could just take a back step. The simple arithmetic doesn't quite work here. As Mr. Malachowski explained, it's more complicated than that if you look at the business planning. And he looked at the actual planning documents that Reynolds undertook when entering into this agreement and the range of scenarios they plotted out, one of which was 5.25%. That's the $44 million number. And that what his testimony was, was that it gave him comfort that in light of first, the Newmark agreement came first. So these are not unrelated agreements. Fontham was the party to both of them. Newmark, which was then Altria, was the counterparty to the first one. Reynolds was the counterparty to the second one. Were they essentially a similar structure. Second, the Reynolds agreement or argument that 2.1% is an appropriate number is important because here we have the situation the court has confronted many times where we have a lump sum license that has to be converted in essence by an expert. And the court has said there's no one right way to do that. The court has said on some occasions that you can't convert it, that it can only be considered as a lump sum, but we don't have that in this case. They agree it can be converted. So then we have a battle of the experts, right? We have Mr. Malachowski saying that the two agreements considered together have multiple paths to 5.25%. But what's the problem with the way that the reduction of the lump sum to the percentage was done by Reynolds' expert, which came to 2.1%? What's the flaw in that? The arithmetic looks pretty unimpeachable. Well, it's hindsight reasoning, Your Honor, that that math was done knowing the actual sales for the period of the agreement. Remember, the agreement was entered into years previously. Right, but it's for $79 million. Yes, Your Honor. And over a period leading from the time of the agreement until 2030. So that's an average of 2.1% per year, right? No, Your Honor. If you assume... Well, go ahead, you finish. Well, I don't mean to interrupt. No, no, I invite you to. The $79 million has to be evaluated ex-ante. At the time that license was entered into, that's when Reynolds did the scenario planning that laid out a number of things from a high of hundreds of millions of dollars to a low of tens of millions of dollars with different rates attached to them. The anticipation at the time as to future sales, unknown, of course, was a range. And one item in that range was 5.25%. The mathematical certainty that my friend suggests is known only in hindsight, but the jury would not have known that, the parties would not have known that at the time of the hypothetical negotiation, right? The hypothetical negotiation in this case would have taken place before all those sales occurred. So it's mixing apples and oranges, if you will, because they're using post-licensing sales that would not have been known to the parties at the time of the hypothetical negotiation to inject that false certainty into the arrangement. So if the sales were way lower than had been anticipated as a medium level, then the license would be a higher percentage. If the sales were much higher, lower percentage. If they never made any sales at all, they paid $79 million for nothing they ever used. And that's why it has to be looked at ex-ante rather than ex-post. And in the ex-ante scenario, that's where Mr. Malachowski looked at the range of scenario planning done by Reynolds, and he was extensively cross-examined on this, to find where 5.25% lay in there. And it turned out under Mr. Malachowski's analysis that it actually comported with the real world payments with the timing issue the court has noted, right? Because of the seizing of the sales. There's so many numbers, so forgive me if I'm getting this messed up. But on the other license then, that's the $43, $44 million question, right? Yes, ma'am. If you enter a license and it's for a period, which is 2017 through 2029, why don't those figures stick? I mean, they couldn't have, you talk about here, but at the time they didn't contemplate that this would all be done by 2023. So how is it appropriate to use a number based on a period of years, which were not contemplated in the earlier agreement? And Judge Prost, I apologize. The answer I just gave to Judge Bryson, I was actually speaking of the Newmark agreement, not the Reynolds agreement. Okay, well maybe that's what... Does it also apply to the Reynolds agreement, the same answer? The Newmark agreement is the $44 million one. Right, but does it apply equally to the 79? Yes, Your Honor. Mr. Malachowski looked at the scenario planning for both of them. They both have to be considered ex-ante for purposes of a hypothetical negotiation, which would have been very close in time to the... All right, so it's the same answer. It is the same answer. But specifically to the $44 million, Your Honor, the projections actually made by Newmark showed a range of sales, right? And that could be based on any number of factors, changes in the market, availability of consumers and so forth. It turns out, again, in hindsight, retrospect that it stopped in 2023 so that the sales fit into that spray chart, that scenario analysis. Right, but as you said to Judge Bryson earlier, you're not supposed to look at it in hindsight. You're supposed to look at what the parties contemplated at the time, and that was through 2029. And at the time they entered it into, Your Honor, one of the scenarios that Newmark planned for was a $44 million scenario. It wasn't because of the time, it was because of the number of sales. And that was a 5.25% rate, which also is reflected in three other places, of course, in that agreement, the first agreement, the face of the agreement, the most favored licensee clause and so forth. And so... Is there evidence that $44 million was the amount that they anticipated selling throughout the period or until 2023? The scenario... I thought that the scenario stopped at 2023. Your Honor, the actual sales stopped at 2023. The scenario planning was for a range of scenarios that I don't believe was time-limited. It was total sales over the period of the agreement. I thought they had to renegotiate. I thought they paid some money up front and then there was some second stage to this. Am I misremembering? To Newmark. Yeah. Yes, Your Honor. Okay, so how does that affect the discussion we've been having? Well, so Mr. Malachowski, what he did... Again, the $44 million point was a confirmatory point that he said, let's look at what they were planning at the time. One of the ranges was $5.25 million. He did not go, Judge Bryson, or Judge Gross to the specific of the timing, but rather the total sales. And as it turned out, the total sales were in that range. The point about the referee clause, Judge Prost, you asked my friend about, I think is very important because... Which agreement? You're making me as confused as I am on that. Which agreement was that in? That wasn't in both, right? Both have a referee clause. Counselor, before we move on, let me have a couple of questions about the Newmark agreement. Now, it contains a fair assurance clause and a referee clause, right? Yes. Were those in the Reynolds agreement? The referee clause is in the Reynolds agreement. The Newmark also has a most favored licensing clause. So when the jury looks at the fair assurance clause, what is it that they would be thinking? What does that mean to you? So what Mr. Malachowski's testimony was at pages 28, 33, 66 to 67, was that no one else in the industry is going to get a better deal than is in the license... The 5.25%? Correct. So what this means to the jury is that 5.25% is a good deal or the best deal? Essentially, as the industry standard was Mr. Malachowski's testimony based both on the MFL clause and on the Reynolds stipulation that it was aware that FONTAM had licensed its patents to multiple players in the industry for 5.25%. So that there was an industry standard evidence in this case based on the internal structure of the licenses as well as the stipulation Reynolds entered into for purposes of this case, both of which were before the jury in considering this evidence. And the referee clause in particular, which says it can't go lower than 3.6%, Judge Prost, there are a lot of numbers flying around, but we know that 2.1% and more importantly 0.21%, which are the numbers suggested by Reynolds, are way below 3.6%. And we submit and Mr. Malachowski testified to the jury that there's no way to read the referee clause as going below 3.6%. He said that basically has some headroom between 5.25 and 3.6, but that it establishes that we know that these licenses are above 3.6%, otherwise the referee clause doesn't really have any function. And given, and that's the number that has meaning and more clarity than the 5.25%, what if the jury had come back with 3.6? Would you have any argument there? I think, Your Honor, the jury would have substantial evidence to select a rate that was supported by the licenses. 3.6% absolutely is on both licenses and it is a number that was supported. Neither expert testified to it, but of course we know from this court's cases that a jury may go with the evidence even if it's not supported by the expert testimony. I don't think going below 3.6% is supported by anything in either of these licenses. That's the point of the referee clause and the problem with the Reynolds argument because they came to the jury, they didn't offer a number that was supported by the licenses. They used the straight arithmetic approach as to one license and then argued that should be the number discounted by 90%. And that was not supported by the evidence. So we think the only number that was supported by the evidence, the jury's number absolutely is supported. In the court's hypothetical, 3.6% could be. I can't answer definitively, but it's certainly in the agreement. It wouldn't accord with the stipulation, but it would be there. It can't be 2.1%. It can't be 0.21% because then we would have a conflict with the very evidence on which the jury was asked to make its decision. Again, without objection from Reynolds. Returning, if you could, for just a moment to the Reynolds agreement. Now you said that there were various projections that would lead to different percentage royalties. What was the evidence as to the projection that would have led to a 5.25% royalty? In other words, that would have been a projection of very low sales. What was the internal evidence that you mentioned earlier that led you to think that 5.25% was one of the numbers that could have been supported? So Judge Bryson, Mr. Malachowski had two principal opinions as to the Reynolds agreement, which was the second of the two agreements. The first was the stipulation that Reynolds itself entered into that it was aware that Fontham licensed these patents to the industry for 5.25%. And the second was the referee clause that it would be at least 3.6%. I guess my question is, was there anything beyond that in the internal materials that he reviewed that suggested if we sell many fewer than we expect to sell, then the number would be 5.25%. Not for Reynolds, Your Honor. He had more detailed information for Newmark than he did for Reynolds. Newmark had the low and mid-level expectations. It actually had a much broader range. Two of those are mentioned in Reynolds' brief, but it actually had a range of scenario plannings. And Mr. Malachowski had access to all the internal business planning documents from Newmark at the time that was made. So it was a much more robust set of information for Newmark than it was for Reynolds. And, you know, the Newmark agreement came first and it was really the basis for Mr. Malachowski's opinion, including, you know, the structural features that were then carried over to Reynolds. So, you know, he treated them paired, not separately, because they were from the same parties, the same thing. Okay, thank you. Thank you, Your Honor. We still have two minutes, everybody. Thank you, Judge Price. I just want to clarify that the 0.21% was the post-apportionment rate. So just want to be clear that Reynolds' position was that these two agreements, or actually just the one, the Fontam-Reynolds agreement being the most comparable, would allow the jury to find 2.1% as the relevant rate. That's very similar to what would be supported by the Fontam-Newmark if you take half of the low range of sales for $89 million, take that 5.25 down to half of 5.25, you get close to 2.1 again. We only got the 0.21 through apportionment. We looked at the Fontam licenses and we said not all of those patents are relevant to the Altria patents here, only 10% of them. So that's where that number comes from. I think what you've heard is that the Fontam-Reynolds agreement doesn't support the rate. It has a $79 million number in it. What Mr. Malachowski testified at trial was we can still take comfort in this agreement because we have the stipulation. But the stipulation doesn't explain the $79 million number and the stipulation was based on other Fontam agreements that are not in play. I hate to interrupt you, but can I ask a question? But we've got a black box jury verdict. So if we find one license supports, the jury was, there's substantial evidence to support the jury three lines on only one of the two licenses. It's still on the firm, correct? I agree with that, Judge Prost. I agree. And that's why it's important for the Fontam-Newmark agreement. That 5.25 number that's on the face, that doesn't apply here. That was for transfers overseas to a third party for overseas sales. Doesn't the base of the agreement say that this is USA? This is USA based? It does on the face because there was actually sort of two agreements in one for Fontam-Newmark. There was the fixed payments to Newmark for Newmark. The agreement, the reference is a 5.25. That clearly was for US sales, right? At least that's what the jury would see when they saw US on there. The 5.25, Newmark did not pay 5.25% for US based sales of its products that practiced the patents. It would have paid 5.25% for transfers overseas for sales of products overseas or at the lower actually of 6% per cartridge. So there's even that nuance and complication. The 5.25% rate that was paraded before the jury did not apply to what would be the hypothetical comparable license here, which is a US based license for products sold in the US. I see I'm over my time. Thank you, Your Honors. Thank you. Thank both sides. The case is submitted.